IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JESUS BOCANEGRA,
RAUL MIRAMONTES and
JOSE LUIS VILLEGAS-MACIAS
       Defendants

CRIMINAL CASE NUMBER:
1:13-CR-0039-WBH-JSA

## ORDER AND REPORT AND RECOMMENDATION

On February 1, 2013, the Government filed a criminal complaint charging
Defendants Jesus Bocanegra, Raul Miramontes and Jose Luis Villegas-Macias with
federal narcotics trafficking violations. *See* Complaint [1]. On February 5, 2013, a
federal grand jury returned a two count Indictment alleging that the Defendants
conspired to knowingly and intentionally possessed with intent to distribute at least
1,000 kilograms of marijuana, in violation of Title 21, United States Code,
Sections 846 and 841(b)(1)(A)(vii). *See* Indictment [2]. This case is now before the
Court on a variety of motions, consisting of:

•     Defendant Jesus Bocanegra's motions to suppress the statements and other

        evidence obtained from his November 16, 2012 arrest [50] [52] [60], on the

principal basis that his arrest was unreasonable under the Fourth Amendment;[1] and

• All three Defendants' joint "Motion to Dismiss On Speedy Trial and Criminal Rules 5 and 5.1," [51] which alleges that the Government failed to timely indict the Defendants after their November 16, 2013 arrests.[2]

On November 19, 2013, the Court held an evidentiary hearing on these motions. [94]. The parties thereafter filed post-hearing briefs. [103] [104] [105] [107] [108] [112]. For the reasons stated below, the Court **RECOMMENDS** that Defendant Bocanegra's Motions to Suppress [50] [52] [60] and Defendants' Motion to Dismiss [51] be **DENIED**.

---

[1] Originally, Defendant Villegas-Macias filed a Motion to Suppress Statements [50] and also a Motion to Suppress Search and Seizure [52]. Defendants Bocanegra and Miramontes moved to adopt those motions [59] [63]. However, the Government subsequently filed a Notice [73] stating that it does not intend to use statements or other evidence obtained from the arrests of Defendants Miramontes and Villegas-Macias. These Defendants do not contest that their suppression motions are now moot in light of the Government's Notice and they have not perfected any legal arguments for suppression of this evidence in post-hearing briefs. Thus, the only suppression issue that remains before the Court is Defendant Bocanegra's Motion to Suppress the fruits of his allegedly unlawful arrest [60] and the original Motions to Suppress statements and evidence [50] [52] to the extent adopted by Defendant Bocanegra.

[2] This motion was originally filed by Defendant Villegas-Macias but the other Defendants have requested to adopt the motion [59][64].

# FACTS

## A.    Events Leading To The Arrests Of The Defendants

On November 7, 2012, agents with U.S. Customs and Border Protection ("CBP") inspected a tractor-trailer at the Laredo, Texas border crossing. *See* Transcript of November 19, 2013 evidentiary hearing [Doc. 100] ("Tr.") at 9–12. An x-ray image of the trailer revealed a greater density in the front section, which suggested the presence of narcotics. *Id*. at 9-10.  A drug-sniffing canine alerted to the tractor-trailer as containing narcotics.  *Id.* at 10.  Agents then drilled into the suspicious area, and the drill came out with a substance that tested positive for marijuana.  *Id*.  Shipping documents revealed that the trailer was headed to 3750 Venture Drive in Duluth, Georgia, which agents determined to be the location of a retail store called Arteland Furniture ("Arteland"). *Id.* at 11-12.

Agents with U.S. Homeland Security Investigations ("HSI") arranged a controlled delivery of the tractor-trailer to Arteland.  *Id.* at 12-13.  Over a week later, on November 15, the truck driven by an undercover HSI agent reached Arteland, and a silver Ford F-150 arrived roughly an hour later.  *Id.* at 16. The driver of the silver Ford F-150, later identified as Defendant Bocanegra, and six other males began unloading furniture from the tractor-trailer.  *Id*. at 16–17.  HSI

determined that Defendant Bocanegra was the owner of Arteland.  *Id.* at 22.

Bocanegra told the undercover agent driving the truck that half of the trailer's

cargo would be unloaded at Arteland and the remainder would be unloaded at a

nearby location.  *Id.* at 17.  After the material destined for Arteland was unloaded,

Bocanegra led the tractor-trailer to the second location, which is a strip mall

located at 2930 Old Norcross Road, also in Norcross. *Id.* at 18–22.  The workers

then unloaded the remainder of the cargo into Suite 400 of 2930 Old Norcross

Road, an apparently empty storefront.  *Id*. at 19–20, 48–49.  Workers unloaded

roughly a hundred large entertainment centers that were located in the front section

of the tractor trailer, which HSI agents suspected contained marijuana based on the

x-ray images obtained in Laredo.  *Id*. at 49–50, 51.

    After the workers left, HSI agents working with local law enforcement

officers surveilled both locations overnight, and no activity was seen.  *Id*. at 20, 50.

The next day, the silver Ford F-150 drove to a parking lot adjacent to the empty

storefront and stopped.  *Id*. at 52.  The pick up truck then pulled up next to a

surveillance van parked at the scene, and Defendant Bocanegra appeared to look

inside the van. *Id*. at 21–22, 52.  Defendant Bocanegra returned to the pickup truck

and drove it to the storefront, and Bocanegra and two individuals (later identified

as Co-Defendants Villegas-Macias and Miramontes) unlocked the padlock on the

door and entered. *Id*. at 22, 52–53.  While the Defendants were inside the storefront, a different vehicle arrived and drove from parking lot to parking lot adjacent to the strip mall, apparently "conducting countersurveillance." *Id*. at 53-54.  The Defendants remained in the storefront for approximately five hours.  *Id*. at 22.

At approximately 1 pm, the Defendants exited the empty storefront and re-applied the lock. *Id*. at 54–55.  The Defendants then drove off, and the officers made the decision to stop and arrest the Defendants after they parked at a nearby Chick-Fil-A. *Id*. at 23, 90–91.  The Defendants were brought back to the storefront location at 2930 Old Norcross Road, and the Defendants' cell phones were seized. [Id. at 25:1–4, 33:4–12]. The officers then executed a federal search warrant that had previously been obtained for 2930 Old Norcross Road, where bundles of marijuana were discovered.  *Id*. at 40.  At some point while in custody at the storefront location, Defendant Bocanegra blurted out to the agents that "my cousin had nothing to do with this." *Id.* at 27, 29-31.  He repeated this statement after being furnished *Miranda* warnings but declined to say anything further.  *Id.* at 32.

## B.    Events Leading To This Federal Indictment

HSI Special Agent Switzer contacted the United States Attorney's Office

after the Defendants were arrested, and Assistant U.S. Attorney ("AUSA")

Schansman told her that the office would decline prosecution because the quantity

of narcotics did not meet the threshold for federal prosecution. *Id*. at 93. Officers

with the Gwinnett Metro Task Force then took custody of the Defendants and the

seized evidence, brought the Defendants to the Gwinnett Detention Center, and

booked them on state charges of trafficking in marijuana in violation of O.C.G.A. §

16-13-31. *Id*. at 93, 118. The officers also obtained state search warrants for

Bocanegra's cell phone, and residential premises. *Id*. at 110. Despite the federal

declination and subsequent state prosecution, HSI kept trying to convince the

United States Attorney's Office to reverse its decision and accept the case for

federal prosecution. *Id.* at 95, 136. On November 18, 2012, Special Agent

Switzer gave AUSA Schansman a revised estimate for the amount of marijuana

recovered in the search of the empty storefront, and AUSA Schansman responded,

"Better. But still not gonna make the cut. Great job though. I'm sure Gwinnett Cty

will be glad to take it." *Id.* at 94, DE-4 at Jencks-15.

Apparently, the United States Attorney's Office did reverse its decision and

agreed to accept the file on or about December 5, 2012. On December 6, 2012,

AUSA Schansman told Special Agent Switzer that an AUSA "will be in contact

with you once they get the assignment. Literally it had just been decided

yesterday." *Id*. at DE-4, Jencks-14.  On December 10, 2012, Schansman's supervisor, AUSA Scott Hulsey, told Special Agent DaRin that "we will be taking the controlled delivery." *Id*. at 137.  Special Agent Switzer and AUSA Schansman exchanged additional emails in the ensuing weeks in which they discussed getting another AUSA assigned to the case.  *Id*. at 101.  On January 4, 2012, AUSA Schansman told Special Agent Switzer that she finally spoke with Gwinnett County Assistant District Attorney Jimmie Baggett, and "it looks like we will take [the case]." *Id*. at 100, DE-4 at Jencks-19.  On February 1, 2013, Special Agent Switzer obtained a federal criminal complaint against the Defendants signed by a United States Magistrate Judge. [1] On February 5, 2013, a federal grand jury returned the instant Indictment [2], and the Gwinnett County District Attorney's Office dismissed the state charges against the Defendants.  Tr. at 102.  The Defendants were brought before United States Magistrate Judge Russell G. Vineyard the next day for their initial appearances on the Indictment. [11] [16] [22].

## **DISCUSSION**

## I.      **LOGISTICAL RULINGS**

Before addressing the substance of any disputed motions, the Court must first engage in some housekeeping to sort out what motions remain at issue in this case.  Defendant Villegas-Macias initially filed a Motion to Suppress Statements [50] and a Motion to Suppress Search and Seizure Evidence [52].  Defendants Bocanegra and Miramontes both requested to adopt those motions [59]  [63].  Defendant Bocanegra also separately filed a Motion To Suppress Arrest Pursuant To *Bailey v. United States* [60], which appears duplicative of the motion filed by Defendant Villegas-Macias [52] that Defendant Bocanegra requested to adopt.  Defendant Villegas-Macias also filed the Motion To Dismiss On Speedy Trial [51], and Defendants Bocanegra and Miramontes seek to adopt that motion as well [59] [64].

Technically, Defendants Bocanegra and Miramontes' Motions to Adopt [59] [63] [64] remain pending.  Thus, the Court formally **GRANTS** those motions.

However, all suppression issues identified in these motions as to Defendants Villegas-Macias and Miramontes are moot.  The Government has now filed a Notice [73] stating that it does not intend to use statements or other evidence

obtained from the arrests of Defendants Miramontes and Villegas-Macias.  The
Government asserts and these Defendants do not contest that their suppression
motions are now moot in light of the Government's Notice and they have not
perfected any legal arguments for suppression of this evidence in post-hearing
briefs.  Thus, the Court **RECOMMENDS** that all pending Motions to Suppress
[50] [52] [60] be **DENIED** as moot as to Defendants Villegas-Macias and
Miramontes.

As a result, what remains before the Court for substantive analysis are the
Motions to Suppress [50] [52] [60] as they relate to Defendant Bocanegra, and the
Motion To Dismiss for Speedy Trial [51], which pertains to all three Defendants.
Those motions are discussed below.

## II.     RECOMMENDED RULING ON DEFENDANT BOCANEGRA'S MOTIONS TO SUPPRESS

### A.     Motions Alleging Fourth Amendment Violations [52] [60]

Defendant Bocanegra moves to suppress the evidence resulting from his
arrest on November 16, 2012, alleging that the arresting officers had no lawful
basis to seize him. [52] [60].  Defendant asserts that the seizure was not justifiable
under the Supreme Court's decisions in *Michigan v. Summers*, 452 U.S. 692
(1981) and *Bailey v. United States*, 133 S.Ct. 1031 (2013), which govern when

officers can detain the occupants of premises on the grounds of a pending search.

Specifically, in *Michigan*, 452 U.S. at 692, the Court authorized law enforcement to detain the occupants of premises subject to a valid search warrant while the search is underway.  In *Bailey*, however, the Court limited this authorization to where occupants are found in the immediate vicinity of the premises at the commencement of the search; the Court found that the *Michigan* rationale could not justify seizure of an earlier occupant who had already left the premises and was found one mile away from the search location.  133 S.Ct. at 1042-1043.  Defendant here points out that he and his Co-Defendants were arrested at a Chik-Fil-A parking lot two miles away from the search location, and that this seizure therefore fails under *Bailey*.

The Government does not disagree that Defendant's seizure cannot be justified as a *Michigan* detention, that is, in aid of the search warrant being executed two miles away.  The Government's position, rather, is that Defendant was arrested on the basis of probable cause that he had committed a crime.  *See, e.g., Devenpeck v. Alford*, 543 U.S. 146 (2004) ("a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.") The Government argues that the arresting officers possessed probable cause to believe that

Defendant Bocanegra was involved in illegal drug trafficking based on his control and custody over the marijuana shipment; his ownership of the delivery location (Arteland); his direction of the workers unloading the shipment; his direction to the driver that the front section of the trailer (which was known to contain marijuana based on the results of the drilling and drug testing in Laredo) be unloaded at a separate, empty, location; the apparent counter-surveillance activities on November 16; and his presence in the otherwise defunct storefront for five hours that morning.  *See* Gov't Br. [108] at 11-12.

Defendant makes the legal assertion that "an arrest is not justified by what the subsequent search discloses."  Def. Amended Supp. Br. [105] at 6.  But the Government does not attempt to establish probable cause based on what was subsequently obtained in the search.  Rather, the Government asserts that probable cause existed based on all of the facts already known at the point of arrest.  Defendant does not contest that these facts constitute probable cause, and the Court finds that they do.  *See United States v. Willis*, 759 F.2d 1486, 1495 (11th Cir. 1985) (probable cause justified arrest of individual who filled out a fuel order for a plane relating to a trip in which the place was found to contain cocaine).

Defendant's other arguments are unclear.  Defendant appears to argue that *Bailey* goes beyond just limiting the application of *Michigan* and instead also

restricts warrantless arrests even where based on probable cause.  *See* Def.

Amended Post-Hearing Br. [105] at 5-9.  Defendant does not cite any clear

statement to this effect in *Bailey*.  Rather, Defendant argues that this ruling is

implicit, because the Government in *Bailey* also attempted to justify the seizure as

a probable cause arrest, and the Supreme Court ignored this argument.  Def.

Amended Post-Hearing Br. [105] at 6.  According to Defendant, this silence

suggests that the Court intended to find that probable cause, absent a warrant,

would not legally justify the arrest.  *See id.* ("The fact that the *Bailey* court chose to

sidestep the government's reliance upon probable cause, and focus on the manner

of arrest instructs us that the principles supporting the necessity of a warrant can at

times outweigh the interests the government has in a singular arrest.")  This

argument fails for numerous reasons.

    First, *Bailey* did not purport to invalidate the long line of binding precedent

stating that law enforcement can make warrantless arrests on the basis of probable

cause.  All *Bailey* held was that "[o]nce an individual has left the immediate

vicinity of a premises to be searched ... detentions must be justified by some other

rationale," that is, something other than the limited authorization allowed by

*Michigan v. Summers*.  *See Bailey*, 133 S.Ct. at 1037.  This case provides

absolutely no basis for this Court to decline to follow clear and long-standing

precedents authorizing warrantless seizures on the basis of probable cause.  *See*

*Florida League of Prof. Lobbyists v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996)

(stating that, until instructed by a superior court that a precedent has been

overruled, "we are not at liberty to disregard that" precedent, even based on an

argument that it has been undermined by subsequent decisions).  Obviously, if the

Supreme Court intended to make the massive change to Fourth Amendment

jurisprudence that Defendant supposes, the Supreme Court would have clearly said

so, and it is not for this Court to divine that holding from implication and silence.

Second, Defendant's reading of *Bailey* is clearly wrong.  *Bailey* expressly

stated that reasonable suspicion and probable cause remain valid bases for

detention.  In limiting the scope of a *Michigan* detention, *Bailey* stated that "[i]f

officers elect to defer the detention until the suspect or departing occupant leaves

the immediate vicinity [of the premises to be searched], the lawfulness of detention

is controlled by other standards, including, of course, a brief stop for questioning

based on reasonable suspicion under [*Terry v. Ohio*] or an arrest ***based on probable***

***cause***."  *Bailey*, 133 S.Ct. at 1042.  The Court also contrasted a *Michigan*

detention, in which probable cause is lacking, with "the general rule that Fourth

Amendment seizures are 'reasonable' ***only if based on probable cause to believe***

***that the individual has committed a crime***."  *Id.* at 1037.  The Court stated that the

legality and reasonableness of probable cause arrests has "roots that are deep in our

history," and "represents the accumulated wisdom of precedent and experience as

to the minimum justification necessary to make the kind of intrusion involved in an

arrest 'reasonable' under the Fourth Amendment."  *Id.* at 1037 (internal citations

and quotations omitted).  How Defendant could divine from this language an intent

to invalidate probable cause arrests is simply perplexing.

That the *Bailey* Court chose not to address whether probable cause or some

other theory justified the seizure in that case is meaningless.  Indeed, the Court

expressly disclaimed any opinion on whether other alternative Fourth Amendment

justifications existed for the seizure.  *See id.* at 1042 ("it must be noted that the

District Court, as an alternative ruling, held that stopping petitioner was lawful

under *Terry*. This opinion expresses no view on that issue. It will be open, on

remand, for the Court of Appeals to address the matter and to determine whether,

assuming the *Terry* stop was valid, it yielded information that justified the

detention the officers then imposed.").[3] Indeed, on remand, the Second Circuit has

---

[3] Defendant attaches the United States' brief opposing *certoriari* in *Bailey* in support of his argument. [105-1].  In this brief, among other arguments, the United States argued that *Bailey* was a poor vehicle for reconsidering *Michigan*, because the seizure was independently justified as a valid *Terry* stop and even a probable cause arrest. [105-1] at 6-7.  Defendant seems to conclude that, because the Supreme Court accepted *certoriari* in the face of this argument, and then declined to address the existence of probable cause/reasonable suspicion, that the Court must have found that nothing short of a warrant could have justified the detention.

since found that no retrial in *Bailey* is warranted, because the evidence obtained

from the seizure in that case was independently justified on grounds of a valid

*Terry* stop.  *See United States v. Bailey*, – F.3d –, 2014 WL 657932, *11 (2d Cir.

February 21, 2014).  Indeed, the Second Circuit rejected the exact argument

Defendant appears to make here:

> Bailey submits that such a conclusion [*i.e.*, permitting admission of the
> evidence on the grounds that the seizure was a valid *Terry* stop] would
> allow the government to do under Terry what the Supreme Court, in
> *Bailey III*, specifically said it could not do under *Summers*, *i.e.*, detain a
> person away from the premises pending a search. In fact, *Bailey III* holds
> only that the *Summers* rule allowing persons to be detained incident to
> searches without probable cause or a reasonable basis to suspect their
> involvement in criminal activity is geographically cabined to the
> immediate vicinity of the search site. *Bailey III* did not hold that a valid
> *Terry* stop of a person who is reasonably suspected of ongoing criminal
> activity at a location about to be searched could not be detained off site
> for the brief period it took to see if the search confirmed or dispelled
> those reasonable suspicions.

*Id.*

The undersigned cannot say it any better than the Second Circuit did.  *Bailey*

simply has no bearing on a case, such as this one, in which the arrest was justified

as a probable cause arrest, and where the Government does not even attempt to

justify it on the basis of *Michigan*.  Defendant Bocanegra's patently meritless

---

This is a clearly incorrect reading of *Bailey*, which expressly remanded for
assessment of the question of whether *Terry* justified the seizure.

Motion should be **DENIED**.

### B.    Motion Alleging Fifth Amendment Violations [50]

Defendant Bocanegra also adopted the Motion originally filed by Defendant

Villegas-Macias [50], seeking to suppress statements on the grounds that they were

rendered involuntarily and in violation of *Miranda v. Arizona*, 384 U.S. 436

(1966).

In *Miranda*, 384 U.S. at 436, the Supreme Court held that a suspect who is

in custody must be advised of his right to remain silent and of his right to the

assistance of counsel prior to any interrogation by law enforcement.  The

Government has the burden to show the knowing and intelligent nature of a

*Miranda* waiver. *Id.* at 475.  The Supreme Court instructs courts to look for two

things:

> First, the relinquishment of the right must have been voluntary in the
> sense that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being
> abandoned and the consequences of the decision to abandon it. Only if
> the totality of the circumstances surrounding the interrogation reveal[s]
> both an uncoerced choice and the requisite level of comprehension may
> a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation

omitted).

In addition to its compliance with *Miranda*, the Government must also show that the Defendant's statements were made voluntarily.  *See Jackson v. Denno*, 378 U.S. 368 (1964).  Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Here, although Defendant adopted the original Motion To Suppress Statements [50], he did not argue in his post-hearing brief that his statements were involuntarily made or that the Government violated *Miranda*.[4]  Rather, the only

---

[4] The Court made clear in the pre-trial conference that the Motion to Suppress Statements [50] was among the motions to be covered in the evidentiary hearing.  *See* [65].  The Court also stated during the hearing itself that any factual record necessary for that motion should be made during that hearing and that any legal arguments in support of the motion must be covered in the post-hearing

suppression arguments advanced in Defendant's post-hearing brief was that his statements and other evidence should be suppressed on the basis of the unlawful seizure.  Thus, it appears Defendant has abandoned any objection to admissibility on grounds of Fifth Amendment and/or *Miranda* violations.

Nevertheless, the Court *sua sponte* finds that the record adduced at the hearing establishes voluntariness and compliance with *Miranda*.  Defendant Bocanegra initiated the interview by stating, prior to questioning: "I want to talk. My cousin had nothing to do with this."  Tr. at 27, 29-31.  The agents immediately stopped him from saying anything further, and then took him outside to read him his *Miranda* warnings, which they did in the Defendant's native Spanish.  Tr. at 30.  Defendant kept repeating, even without questioning, "my cousin had nothing to do with this."  *Id.* at 31.  No threats or promises were made to induce Defendant to waive his rights.  *Id.* at 32-33.  Defendant did not appear to slur his words or be under the influence of any substances.  *Id.*  Perhaps most clearly showing that he understood his rights, the Defendant stated that "he wasn't going to make any other statements other than the one statement he was making," *i.e.*, that his cousin was innocent.  *Id.*  These facts support a finding of voluntariness.  That Defendant decided to affirmatively make statements exculpating his cousin while declining to

---

briefs.  Tr. at 27-29.

otherwise make any statements further inculpating himself strongly shows that the Defendant was acting purposefully, out of his own volition, and not out of any undue pressure.  Thus, to the extent it has not been abandoned, Defendant's Motion to Suppress Statements [50] should be **DENIED** on the merits.

## III.   RECOMMENDED RULING ON DEFENDANTS' MOTION TO DISMISS FOR SPEEDY TRIAL VIOLATIONS

The Speedy Trial Act, Title 18, U.S.C. § 3161(b), provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges."  A violation of this requirement requires dismissal, although the Court has the discretion to dismiss with or without prejudice.  *See* 18 U.S.C. § 3162(a).

The Supreme Court has made clear, however, that "an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign."  *United States v. MacDonald*, 456 U.S. 1, 10 n.11 (1982).  The Speedy Trial Act clock, in other words, starts only when a Defendant is arrested on federal charges.  *See also United States v. Garner*, 32 F.3d 1305, 1309 (8th Cir.1994) ("The arrest on state charges does not engage the speedy trial protection for a subsequent federal

charge.")

Here, Defendants were not arrested on any federal charges until after the Indictment was issued. While Defendants were taken into custody almost 90 days earlier, on November 16, 2012, that was based on state charges. Per the plain language of the Act and the principle of separate sovereignty stated in *MacDonald*, these state arrests would not trigger the clock on federal charges.

Defendants, however, ask the Court not to accept the facts at face value. Defendants argue that the state arrests on November 16 should be deemed to start the federal clock on the unique facts of this case. Specifically, Defendants argue that this case was a federal operation throughout, and the state arrests were a mere ruse by which the federal authorities sought to and did circumvent the Speedy Trial Act. In other words, Defendants argue that the state authorities were co-opted and used as tools of the federal government and therefore that no distinction between the two sovereigns should be recognized here.

Defendants cite *United States v. Cordova*, 537 F.2d 1073, 1076 (9th Cir. 1976). *Cordova* reaffirmed the general rule that the federal Speedy Trial Act is not triggered by a state arrest. *Id.* ("The fact of Cordova's arrest in November by state officers is irrelevant to the [Speedy Trial Act] issue before us because that arrest

was for alleged violation of Arizona, not federal, law.")  In that case, however, the

Ninth Circuit also went on to consider whether the state arrest was a "mere

temporary device" to help the federal authorities delay indictment.  *Id.* (internal

citations omitted).  Whether this exception exists under the Speedy Trial Act was

ultimately moot, however, because the Ninth Circuit quickly found as a factual

matter that the state arrest was not a "mere temporary device" and that there was no

reason to disrespect the separate sovereignty of the Arizona prosecutor. *Id.*

The Government responds that the Eleventh Circuit has not recognized a

"mere ruse" exception except in contexts inapplicable here.[5]  Indeed, according to

the Government, the dual sovereignty concept articulated by the Supreme Court in

*MacDonald* (which post-dated the Ninth Circuit's decision in *Cordova*) does not

even permit a "mere ruse" exception in the context of a state arrest.  More

fundamentally, the Government also argues that, just as in *Cordova*, the state

_____

[5] According to the Government, the Eleventh Circuit has expressly
recognized only one "limited exception" in which an arrest on one charge may
trigger the Speedy Trial Act clock even for other charges.  *See United States v.
Noel*, 231 F.3d 833, 836 (11th Cir. 2000).  Specifically, where civil immigration
officers arrest a suspect supposedly on civil deportation charges, but for the actual
purpose of facilitating a criminal investigation and prosecution, that arrest can
trigger the 30-day clock for a criminal indictment.  *Id.*  The Government argues
that this "limited exception" applies only in the immigration context and should
not be applied to a situation where state and federal authorities collude to evade the
30-day deadline.

arrests were no ruse in this case as a matter of fact.

The Court reads with some skepticism the broad legal position argued by the Government, that is, that a state arrest cannot ever trigger the 30-day clock, even where it is a "mere ruse." The Government cites *MacDonald*, but this question was not before the Supreme Court in that case. The Court does not read *MacDonald* or any other authority cited by the Government as foreclosing the "mere ruse" theory. But the Court need not ultimately decide this issue of arguable first impression in this Circuit. Even assuming that this exception were to exist, the facts do not remotely support its application here.

To be sure, while state law enforcement cooperated with and supported various activities, this operation was initiated and led by HSI at least until November 16, 2012. Federal agents undertook the controlled delivery, obtained a federal search warrant, participated in the decision as to when to arrest the Defendants and execute the search warrant, and apparently took the lead in executing the search warrant.

But the facts show that after execution of the search warrant, federal prosecution was declined, and the state took over. The Court finds no ruse in that chronology. No matter the federal nature of the law enforcement *investigation*, a

decision on whether federal *charges* would issue was not going to be made until

after quantity of drugs was determined.  Here, after the searches were completed,

the U.S. Attorney determined the quantity of drugs to be too low to justify federal

prosecution.  It was that decision to decline federal prosecution that resulted in

Gwinnett County police taking the case for state prosecution.  At that point, this

was now a state case.  The facts show that the state officers took custody of the

evidence, obtained additional state warrants, and there is no evidence showing that

the case was not proceeding as it would have been expected to with the state

authorities.[6]

That HSI ultimately persuaded the U.S. Attorney's Office to change its mind

about pursuing federal prosecution does not show the state proceeding to be a

sham.  It simply suggests that the federal authorities re-assessed the importance of

the case, for whatever reason, and ultimately agreed with the agents that it was

worth the devotion of federal resources.  Nor is it significant that the state declined

---

[6] Defendants argue that "Gwinnett County prosecutors took no steps (after the initial arrests and bond hearings) to indict or prosecute the case."  Def. Reply. [112] at 6.  But Defendants adduced no evidence as to what "steps" were required or even expected to have occurred in the state docket during December 2012 and January 2013.  Indeed, Defendants acknowledge that the deadline for indictment in the Gwinnett County case was not until February 14, 2013.  Def. Br. [104] at 26. The lack of any "steps" to prosecute or indict well before such "steps" were due is not evidence of impropriety.

to proceed once the federal government indicted.  No inference of impropriety can be drawn from a state prosecutor's decision to let federal authorities handle a somewhat ordinary drug trafficking case and thereby not engage in a duplicative state prosecution.   The law does not require local prosecutors to waste taxpayer resources in this fashion in order to prove that their state arrest was not a ruse.

Defendants make much of emails among the federal prosecution team suggesting that the U.S. Attorney's Office had decided to prosecute in early December.  But the decision to pursue federal charges does not itself start the 30-day clock.  Rather, only *arrests* on federal charges trigger the 30-day clock.  Thus, whether the U.S. Attorney's Office "decided" to prosecute on December 5, January 5, or February 5 has no bearing at all on the Speedy Trial analysis.  It remains that, as of the December "decision," the Defendants were still in the custody of a different sovereign, facing separate charges issued by that sovereign, and subject to a separate proceeding governed by and in apparent compliance with that sovereign's laws and procedures.  The record does not suggest to the Court that the Defendants were being held in state custody at the behest of the federal government as a mere ruse.  The federal Speedy Trial Act clock was not triggered.[7]

---

[7] Even if the November 16, 2012 arrests could be deemed federal arrests–on the theory that they were initiated by federal law enforcement with hopes that federal charges would follow–there remains no Speedy Trial Act violation.

In the end, the facts show nothing more than state and federal authorities communicating and coordinating on overlapping, although separate, cases. Nothing about this suggests a fraud, collusion, sham or "mere ruse."  Defendants' Motion should be **DENIED**.

-----

Because Defendants were facing separate charges in a separate proceeding before a separate sovereign government from November 16, 2012 through February 5, 2013, all deadlines under the Speedy Trial Act were tolled.  *See* 18 U.S.C. § 3161(h)(1) (excluding from the 30-day indictment deadline "[a]ny period of delay resulting from other proceedings concerning the Defendant.")

## **CONCLUSION**

Thus, the Court **GRANTS** Defendant Miramontes' and Bocanegra's

Motions to Adopt [59] [63] [64].

The Court further **RECOMMENDS** that the pending suppression motions

[50] [52] [60] and the Motion to Dismiss [51] be **DENIED** as to all Defendants.

**IT IS SO ORDERED** this 26th day of February, 2014.

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE